WALLACE, JUDGE:
These claims, which grew out of the aftermath of the Buffalo Creek Flood Disaster of February 19, 1972, in Logan County, West Virginia, were consolidated. In the late summer or early fall of 1972, the Department of Highways commenced its Project Er-277(1) for the replacement and repair of 16 miles of Route 16 along Buffalo Creek Hollow. The Project was divided into two sections. The work began first on section two (or the northern section) because this section had sustained the worst damage and was basically unoccupied. The owners of property destroyed in this area were being relocated by HUD (Housing and Urban Development).
The appraisal work for properties in the path of the road that were to be acquired by the respondent commenced in the early part of 1973. Most of the appraisers used were independent appraisers retained by the respondent, not regular employees of the respondent.
The claimants, Fields and Tipton, contend that an independent appraiser engaged by the Department of Highways, Morris Pettit, told them that they could not repair their homes because the State was going to take their properties. Fields stated that he was told he could repair enough to protect his furnishings. Both claimants testified that they did not repair their properties and the State did not take them; as a result, the properties deteriorated. Fields subsequently sold his property, while Tipton still occupies his property.
*197 Sometime in 1973 after the project had commenced, the decision was made not to complete section one where the claimants’ properties were located. The area of section one was heavily populated, and completion o'f this section would have displaced too many people with no place to relocate them.
Witnesses for the respondent testified that there was considerable confusion in the area caused by the aftermath of the disaster and the movement of many agencies into the area to assist in the rehabilitation work. There were no set rules or guidelines established for the appraisers in the acquisition of property. In an attempt to alleviate the confusion, public meetings were held to appraise the people of the plans. Also, a newspaper was printed periodically. There was no individual, personal contact with the people.
Lucian Conn, a citizen member of the Disaster Committee established after the flood, testified that respresentatives of the Department of Highways told the people that they could not return to their property because it was to be taken for the highway, and that if the property were improved after being appraised, they would be wasting their money. He also testified that the respondent held public hearings advising people that their property would be acquired.
The claimant Fields testified that he wrote letters and went to the field headquarters and made inquiry, but no one told him that they were not going to take his property. The claimant Tipton stated that he did not attend any meetings or go to the site headquarters and make inquiry.
Terry Tawny, a relocation agent for the respondent, advised claimant Fields to repair only enough to protect his furnishings. He stated that his statement was strictly advice, and not a policy of the respondent. He testified, “I would say it was my own advice, what I would advise anybody, really, not to let their property directly deteriorate because of water damage or weather damage because thinking that the State’s going to take because we don’t always take it.” Tawny further stated that if the claimants attended the acquisition meetings at which the geographical limits were discussed, they would have been advised as to the acquisitions. Explaining the necessity for the meetings, Mr. Tawny testified that “... any change that took place in this valley was known by all within a very few minutes generally. You could say something at *198 Mann and I’ll guarantee you before you could drive to Pardee, that the people at Pardee knew it; C.B.’s, telephones, whatever. It might not be the same thing when it got to Pardee, but by the time you got up there to somebody, they knew about it.”
Morris Pettit, an independent appraiser who appraised the property of both claimants, testified that anything he told the claimants was his personal opinion, and that he would not do anything more to the property until they found out the State’s plans as to acquisition. He also advised the claimants that if they had any questions, they were to contact Mr. Rayburn.
William Rayburn, a right-of-way agent for the respondent, was in charge of acquisition. He maintained respondent’s relocation office in the disaster area. In his testimony, he stated, “I advised all of them that the property belonged to them and we had no authority whatsoever to tell them what to do with their property. At that particular time, the only thing we had were maps telling them that it was going to be taken, but, as far as them repairing their property, it was up to them to do as they saw fit to do because it was their property.”
The Director of the Right of Way Division of the Department of Highways, James E. Bailey, explained that the policy of the Department in situations where the property may be taken is basically to have the property owner maintain the property enough to keep the elements out rather than to make major improvements for which the owner may not be reimbursed by the Department if the property were to be taken at a later date.
Both claimants testified that it was a year to a year and a half they were told their property was to be taken that they found out that the project had been abandoned in section one. The evidence clearly establishes that the respondent had temporary offices in the area to render assistance and advice to the claimants and other people in the area. The evidence further establishes that the respondent had no policy, rules, or regulations which would prohibit the claimants from protecting their property. There were no condemnation proceedings commenced, no contracts entered into, and no offers to purchase the claimants’ properties.
Claimants seem to have relied heavily upon statements made to them by employees of the respondent. The evidence indicates that any such statements which informed the claimants that their property would be taken were clearly erroneous, and, therefore, *199 not binding upon the respondent. It has been held by this Court that promises and representations of a right-of-way agent employed by the respondent, which exceed the scope of the agent’s limited or apparent authority, do not create a contractual obligation on behalf of the State. Boehm v. Department of Highways, 10 Ct. Cl. 110 (1974). The record shows that the respondent did not authorize any of its personnel to tell the claimants herein that the State was going to take their property, and the State is not bound by the unauthorized acts of its officers. All persons who deal with such officers do so at their peril in all matters wherein such officers exceed their legitimate powers. Armstrong Products Corp. v. Martin, 119 W.Va. 50, 192 S.E. 125 (1937).
The Court realizes the magnitude of the Buffalo Creek Disaster and sympathizes with the claimants, but, on the basis of the record, the Court finds that no action was taken by the respondent to acquire the properties of the claimants after the appraisals were made, and that upon proper inquiry, claimants could have ascertained that their property was not to be taken. Accordingly, these claims are disallowed.
Claims disallowed.